06-5332-cv
*Kohler v. Commissioner of Social Security*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: April 29, 2008                              Decided: October 16, 2008)

Docket No. 06-5332-cv

_____

KATHY KOHLER,

*Plaintiff*,

−v.−

MICHAEL J. ASTRUE, Commissioner of Social Security,[*]

*Defendant*.

_____

Before:     STRAUB, POOLER, and SOTOMAYOR, *Circuit Judges*.

_____

Plaintiff Kathy Kohler appeals from a decision of the United States District Court for the Northern District of New York (Sharpe, J.), dated November 3, 2006, granting the motion for judgment on the pleadings by defendant Commissioner of the Social Security Administration ("Commissioner"), and affirming the Commissioner's denial of her application for social security benefits.  We hold that the Administrative Law Judge erred by not following the mandatory "special technique" set forth in 20 C.F.R. § 404.1520a for evaluating the severity of a mental impairment, and we cannot conclude from the current record that this error was harmless. Accordingly, we VACATE the judgment of the district court insofar as it upheld the Commissioner's decision to deny Kohler benefits and we REMAND to the district court with instructions to remand the matter to the Commissioner for further proceedings consistent with this opinion.

_____

[*] Pursuant to Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Commissioner of Social Security Michael J. Astrue is automatically substituted for former Commissioner of Social Security Jo Anne B. Barnhart as the defendant in this case.

MARK SCHNEIDER, Plattsburgh, New York, *for plaintiff*.

ARTHUR SWERDLOFF, Special Assistant United States Attorney (Barbara L. Spivak, Chief Counsel - Region II, Office of the General Counsel Social Security Administration, *on the brief*), *for* Glenn T. Suddaby, United States Attorney for the Northern District of New York, Syracuse, New York, *for defendant*.

SOTOMAYOR, *Circuit Judge*:

Plaintiff Kathy Kohler appeals from a decision of the United States District Court for the Northern District of New York (Sharpe, J.), dated November 3, 2006, granting the motion for judgment on the pleadings by defendant Commissioner of the Social Security Administration ("Commissioner") and affirming the Commissioner's denial of her application for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. We hold that the Administrative Law Judge ("ALJ") erred by not following the mandatory "special technique" set forth in 20 C.F.R. § 404.1520a for evaluating the severity of a mental impairment, and we cannot conclude from the current record that this error was harmless. Accordingly, we VACATE the judgment of the district court insofar as it upheld the Commissioner's decision to deny Kohler benefits and we REMAND to the district court with instructions to remand the matter to the Commissioner for further proceedings consistent with this opinion.

## BACKGROUND

Kathy Kohler, who is now 51 years old, was diagnosed with bipolar disorder in 1992. She applied for SSDI and SSI benefits on March 25, 2002, asserting that her mental impairment constituted a disability preventing her from engaging in substantial gainful employment. Her application was initially denied, but that decision was vacated and remanded by the United States

District Court for the Northern District of New York on October 5, 2004 because of an inaudible tape of the hearing. A second hearing on Kohler's application was held by ALJ Carl Stephan on February 15, 2005. Kohler appeals from the ALJ's decision denying benefits following this hearing.

Medical History

In 1992, Kohler was hospitalized twice within about a month. On the first occasion, she was brought to the hospital by police after she broke down the door of an acquaintance's house. Initially observed to be agitated and confused, her demeanor improved with medication and she was released after two weeks. She was returned to the hospital ten days later by her husband, who reported that she was "out of control." She again was treated with medication and was discharged after approximately two weeks.

In 1996, Kohler moved from Buffalo, NY to the North Country near Plattsburgh, NY, and began receiving medical services from North Star Behavioral Health Services ("North Star"). Her treating physician at North Star at all relevant times has been Naveen Achar. In addition, she was treated at North Star (and later in private practice) by Lorna Jewell, a nurse practitioner. At Kohler's initial screening exam in 1996, Achar noted that Kohler was not in distress, appeared to have a calm mood and bright affect, and was alert and oriented, with good memory, concentration, and judgment. He observed that Kohler's lithium prescription for the prior 4 years "seems to have controlled her mania and depressive symptoms." His notes indicate that Kohler's "global assessment of functioning (GAF)" was 60, and that its highest value during the preceding year was 75.[1]

---

[1] The GAF is a scale promulgated by the American Psychiatric Association to assist "in tracking the clinical progress of individuals [with psychological problems] in global terms." Am.

In April 1998, Kohler was again hospitalized, for just over a week, after the staff of a hospital at which her boyfriend was being treated for injuries from a serious head-on collision found her wandering the hallways, talking to herself and acting bizarrely. She was diagnosed with mild lithium toxicity and showed improvement within 24 hours after her dosage was reduced. She was discharged with a GAF score of 65, which reflects "[s]ome mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).

Jewell's notes from appointments with Kohler in 2000 indicate that Kohler continued to take her medications with good effect, was stable, and generally able to manage the stresses of her daily life, including stresses associated with ending a relationship of six years. After an appointment on January 3, 2001, Jewell similarly noted that Kohler was taking her medication with good effect, "appear[ed] to be stable," and was enjoying her independence.

Two weeks later, however, Kohler's condition deteriorated. On January 16, 2001, she was brought to the emergency room at the direction of Jewell, after Kohler's family reported that her behavior had become increasingly bizarre over the prior two days, and that she was agitated, talking rapidly, and unable to stop running around the house. Kohler reported that she had not

Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000). A GAF between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34. A GAF between 71 and 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g. difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning." *Id.*

been sleeping well, had missed two days of her lithium, and was experiencing symptoms such as extreme irritability and obsessive cleaning. She was given the medication Haldol to help her sleep and was sent home with her brother.

Kohler's family remained concerned about her "changed and still unstable behavior" throughout the following two weeks, leading to a telephone conference with Jewell on January 23, 2001 and an in-person appointment on January 30, 2001. At the appointment, Kohler acknowledged that she was "not doing her best and that an adjustment in medication might be called for." Jewell's notes indicate that Kohler was "not manic, but [was] perhaps approaching hypomania as indicated by her unpatterned sleeping and eating." Jewell hypothesized that the episode had been triggered by emotional stress, and suggested that Kohler might need the assistance of an "intensive case manager" ("ICM") to help organize her affairs. Kohler evidently agreed, and met with an ICM regularly for at least the next year.

Medical Evaluations

Achar, Kohler's treating physician, filled out an evaluation regarding Kohler's ability to do work-related activities on October 21, 2003. He indicated that she had only slight restriction in her ability to understand, remember, and carry out detailed instructions, and to maintain socially appropriate behavior. He further indicated that Kohler had no restriction in her ability to (a) understand, remember, and carry out short, simple instructions; (b) make judgments on simple work-related decisions; and (c) adhere to basic standards of cleanliness. Achar also reported that Kohler had no more than slight restrictions in various work-related social functions, such as interacting appropriately with the public or supervisors.

Kohler was independently evaluated by Brett T. Hartman, a psychologist, on October 9, 2003. He concluded that her prognosis was "fair, given her current stabilization of symptoms."

5

He noted that Kohler reported a history of insomnia, but not in the previous year, and that she experienced a "variety of depressive symptoms at this time." He also noted that Kohler had reported that she "has a history of manic episodes, as recently as 1 ½ years ago, . . . but she has not had such episodes since that time." With respect to Kohler's vocational and functional capacities, Hartman concluded:

> [I]t appears that Ms. Kohler is able to follow and understand simple directions and instructions. She is also able to perform a variety of simple and rote tasks. She has fair attention and concentration skills and a fair ability to learn new information. She also has a fair ability to make appropriate decisions at this time. Claimant may have mild difficulty performing tasks on a consistent basis. She also would appear to have mild to moderate problems performing a variety of complex tasks independently, given her mild intellectual deficits. It would also appear that she would have mild problems relating adequately to others and dealing appropriately with the normal stressors of life.

In addition, Terri Linden Bruni, a state agency psychological consultant, evaluated the record evidence and completed a psychiatric review of Kohler's condition on June 3, 2002. She concluded that Kohler had "bipolar syndrome with a history of episodic periods manifested by full symptomatic picture of both manic and depressive symptoms." She rated Kohler's degree of functional limitation as "slight" for restriction of daily activities and deficiencies maintaining concentration, persistence or pace; as "moderate" for difficulties in maintaining social functioning; and "never" for repeated episodes of deterioration, each of extended duration. Bruni evaluated Kohler to be "not significantly limited" for all indicators except three, in which she found Kohler "moderately limited": (1) ability to maintain attention and concentration for extended periods, (2) ability to complete a normal workday and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and (3) ability to interact appropriately with the general public. Bruni concluded that Kohler had good results controlling her manic symptoms

6

with medication and that her recent mental status exams "ha[d] essentially been within normal limits on all parameters."

Employment

From approximately 1982 to 1991, Kohler worked as a housecleaner for about 30 hours per week. She has not since held steady, long-term employment.[2]

At the time of the hearing in 2005, Kohler's only employment was babysitting a child with Down syndrome once a week for approximately five hours, which she has been doing since 1996. Her two previous jobs (other than babysitting) were in the fall of 2000, when she worked as a cashier at a Citgo gas station and at an Alaskan Oil gas station, in each case for only two to three weeks. Kohler testified that she quit the Citgo job because the company wanted her to make bank deposits late at night and it made her too nervous, and that she left Alaskan Oil because she was nervous around customers and had difficulty concentrating. Kohler also worked as a baker at a supermarket for approximately three weeks in 1998, but she left that job because she "just couldn't handle it any longer."

ALJ Decision

The ALJ found that, as a result of her bipolar disorder, Kohler suffers from a "severe impairment" that limits her capacity to work. He then determined, however, that her impairment "fails to meet or equal the level of severity of any disabling condition contained in Appendix 1, Subpart P of the Social Security Regulations." The ALJ provided little analysis for this conclusion, and instead moved on to evaluate Kohler's residual functional capacity ("RFC"). The ALJ examined Kohler's medical reports, including evaluations by Achar and treatment notes

---

[2] The record indicates that Kohler also worked as a cleaner in an ice-cream and cake shop for approximately 7 months, but does not clarify when she held this job.

by Jewell, and concluded that Kohler generally "displayed mild symptoms" that "appear well controlled" when properly medicated. Based on these medical reports, the ALJ could "identify no more than occasional problems with the claimant's capacity to understand and execute detailed instructions, her capacity to handle work stressors, and her ability to deal with others." He also found "no treating reports which would suggest that the claimant experiences more than occasional problems in social and occupational functioning." He concluded that Kohler had the RFC to perform her past relevant work as a housekeeper/cleaner, and that a finding of "not disabled" was therefore required.

Kohler timely sought review of the ALJ's final determination in the district court pursuant to 42 U.S.C. § 405(g). On November 3, 2006, the district court entered judgment upholding the denial of benefits and granting the Commissioner's motion for judgment on the pleadings. Kohler timely appealed to this Court.

## DISCUSSION

"When deciding an appeal from a denial of disability benefits, we focus on the administrative ruling rather than the district court's opinion." *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000). "On appeal, we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Failure to apply the correct legal standard constitutes reversible error, *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004), including, in certain circumstances, failure to adhere to the applicable regulations, *Schaal v. Apfel*, 134 F.3d 496, 504–05 (2d Cir. 1998).

To be eligible to receive benefits, "an applicant must be 'insured for disability insurance benefits.'" *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (quoting 42 U.S.C. §§ 423(a)(1)(A) & 423(c)(1)). Here, the parties do not contest that Kohler last met the requirements for "insured status" on March 31, 2001. Thus, Kohler must prove that she was disabled within the meaning of the Social Security Act on or before that date.

"Disability" is statutorily defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[3] The Commissioner of Social Security has adopted regulations that provide a five-step framework for evaluating disability claims. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). They are as follows:

> The first step of this process requires the Secretary to determine whether the claimant is presently employed. If the claimant is not employed, the Secretary then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the Secretary next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the Secretary will find the claimant disabled. However, if the claimant does not have a listed impairment, the Secretary must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the Secretary determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the Secretary to prove in the fifth step that the claimant is capable of working.

*Perez*, 77 F.3d at 46; *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[4]

---

[3] The definition of "disability" is the same for SSDI and SSI benefits. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

[4] The regulations applicable to claims for SSI benefits parallel the regulations applicable to claims for SSDI benefits. *Compare* 20 C.F.R. §§ 404.1520 and .1520a (SSDI) *with*

In addition to the five-step analysis outlined in 20 C.F.R. § 404.1520, the Commissioner has promulgated additional regulations governing evaluations of the severity of mental impairments. 20 C.F.R. § 404.1520a. These regulations require application of a "special technique" at the second and third steps of the five-step framework, *Schmidt v. Astrue*, 496 F.3d 833, 844 n.4 (7th Cir. 2007), and at each level of administrative review. 20 C.F.R. § 404.1520a(a). This technique requires the reviewing authority to determine first whether the claimant has a "medically determinable mental impairment." § 404.1520a(b)(1). If the claimant is found to have such an impairment, the reviewing authority must "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)," § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.[5] § 404.1520a(c)(3). According to the regulations, if the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not "severe" and will deny benefits. § 404.1520a(d)(1). If the claimant's mental impairment is severe, the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder.

20 C.F.R. §§ 416.920 and .920a (SSI).

[5] "*Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." United States Social Security Administration, Disability Evaluation Under Social Security § 12.00 (June 2006) *available at* http://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm.

§ 404.1520a(d)(2). If so, the claimant will be found to be disabled. If not, the reviewing authority will then assess the claimant's residual functional capacity. § 404.1520a(d)(3).

Importantly, the regulations require application of this process to be documented. § 404.1520a(e). At the initial and reconsideration levels of administrative review, a medical or psychological consultant generally will complete a standard document, known as a Psychiatric Review Technique Form ("PRTF"). § 404.1520a(e)(1). Until 2000, the regulations also required the ALJ to complete a PRTF and attach it to his decision. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50748 (Aug. 21, 2000) (issuing revised final regulations). While the regulations no longer require the ALJ to complete that standard form, they do require the ALJ's written decision to reflect application of the technique, and explicitly provide that the decision "*must* include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section." § 404.1520a(e)(2) (emphasis added); *see* § 404.1520a(c)(3) (specifying the four functional areas central to the special technique).

The foregoing regulations apply to the evaluation of Kohler's application, and neither party disputes that Kohler's bipolar disorder constitutes a "medically determinable mental impairment." The ALJ therefore was required to evaluate the severity of Kohler's impairment per the procedure set forth in the regulations and summarized above, and to include the necessary findings in his written decision. But the ALJ failed to adhere to the regulations, as his written decision does not reflect application of the special technique and, in particular, lacks specific findings with respect to each of the four functional areas described in § 404.1520a(c).

11

The consequence of noncompliance with 20 C.F.R. § 404.1520a is a matter of first impression in this Circuit. Other courts of appeals have not hesitated to remand where an ALJ's noncompliance with § 404.1520a results in an inadequately developed record with respect to the four functional categories. For example, in *Moore v. Barnhart*, 405 F.3d 1208 (11th Cir. 2005) (per curiam), the Commissioner conceded that the ALJ erred by not completing a PRTF or complying with the mode of analysis set forth in 20 C.F.R. § 404.1520a, but argued that remand was inappropriate because the error was harmless. *Id.* at 1214. The Eleventh Circuit rejected that argument, observing that "[t]he ALJ failed to even analyze or document Moore['s] condition in two of the . . . functional areas: social functioning and prior episodes of decompensation. Because the ALJ's decision lacks consideration of these factors and their impact on his ultimate conclusion as to Moore's RFC, we cannot even evaluate the Commissioner's contention that the error was harmless." *Id.*

Under the previous regulations that required the ALJ to append a PRTF to its written decision, the Ninth Circuit held that failure to follow § 404.1520a requires remand "where there is a colorable claim of mental impairment." *Gutierrez v. Apfel*, 199 F.3d 1048, 1051 (9th Cir. 2000). In doing so, it joined several other circuits that have remanded based on noncompliance with § 404.1520a, either under a harmless error analysis or something akin to it. *See, e.g.*, *Montgomery v. Shalala*, 30 F.3d 98, 100 (8th Cir. 1994) (remanding after concluding that error was not harmless); *Hill v. Sullivan*, 924 F.2d 972, 975 (10th Cir. 1991) (per curiam) ("Since the record contained evidence of a mental impairment that allegedly prevented claimant from working, the Secretary was required to follow the procedure for evaluating the potential mental impairment set forth in his regulations and document the procedure accordingly."); *Stambaugh v.*

12

*Sullivan*, 929 F.2d 292, 296 (7th Cir. 1991) (remanding because ALJ failed to document application of special technique, despite evidence suggesting significant mental impairment).[6]

In this case, the ALJ does not appear to have evaluated each of the four functional areas, and did not record specific findings as to Kohler's degree of limitation in any of the areas. Nor did he conduct a distinct analysis that would permit adequate review on appeal even without the requisite findings. The bulk of the ALJ's decision focused on Kohler's ability to maintain concentration, persistence or pace and her periods of decompensation (or lack thereof). It addressed how Kohler's bipolar disorder restricts her daily activities or social functioning only in general terms, despite some evidence in the record that these limitations were more than mild.[7] It did not make the findings required by the regulations, but nevertheless concluded that Kohler suffered a severe impairment prior to the date she was last insured, and that this impairment "fail[ed] to meet or equal the level of severity of any disabling condition" listed in the regulations.

Effective review by this Court is frustrated by the decision's failure to adhere to the regulations. First, because the decision contains no specific findings regarding Kohler's degree of limitation in the four functional areas by which disabling conditions are rated, the Court cannot determine whether there is substantial evidence for the ALJ's conclusion that Kohler's

---

[6] Both the Ninth and the Tenth Circuits have adhered to these principles after the 2000 revisions to § 404.1520a, albeit in unpublished decisions. *See Shivel v. Astrue*, 260 F. App'x 88, 90–91 (10th Cir. 2008); *Selassie v. Barnhart*, 203 F. App'x 174, 176 (9th Cir. 2006) ("The specific documentation requirements . . . are not mere technicalities that can be ignored as long as the ALJ reaches the same result that it would have if it had followed those requirements.").

[7] For example, the PRTF completed in 2002 by Bruni reports that Kohler suffered "moderate" limitations on her social functioning.

impairment, while severe, was not as severe as any listed disabling condition. Second, the ALJ's decision discusses much of the relevant evidence primarily in the context of Kohler's residual functional capacity to perform work and not in the context of the four functional areas identified by the regulations. Thus, it is not clear whether the ALJ adequately considered the entire record when determining the severity of Kohler's impairment, or whether he might have found it to equal the severity of a listed condition had he followed the regulations and made specific findings regarding Kohler's degree of limitation in each functional area. It also is not clear whether the ALJ would have arrived at the same conclusion regarding Kohler's residual functional capacity to perform work had he adhered to the regulations.

These deficiencies are compounded by the ALJ's tendency to overlook or mischaracterize relevant evidence, often to Kohler's disadvantage. Four examples illustrate that the effects may have been material. First, the ALJ's decision does not mention the PRTF completed by Bruni in 2002. Bruni, who based her evaluation on a review of Kohler's records, rated the limitations on Kohler's social functioning as "moderate." That suggests a more negative assessment than was reached by the ALJ, who could find "no treating reports which would suggest that the claimant experiences more than occasional problems in social and occupational functioning."[8] Second, the ALJ's decision twice emphasizes that nurse practitioner Jewell wrote in February 2002 that

---

[8]   Because Bruni completed the PRTF in 2002, it evaluated Kohler's condition more than a year after she was last insured. Nevertheless, if considered appropriately and with other evidence in the record, the PRTF might have assisted the ALJ in supporting his decision because it was completed specifically to assist evaluations of Kohler's mental condition and rates her degree of limitation in the four functional areas specified by the regulations. Only the limitations on Kohler's social functioning are rated as "moderate" (or equivalent severity), and Bruni concluded that an RFC assessment was necessary.

Kohler "had been stable for several years with but one episode of mania." Jewell's notes in fact state (as the decision elsewhere acknowledges in passing) that Kohler "has been stable for the past several years with one episode of mania *requir[ing] hospitalization in 1997*." That modifier is important because Kohler also experienced a significant episode of mania in mid-January 2001, but that episode did not lead to overnight hospitalization. It also is important, and not mentioned by the ALJ, that the notes from Jewell's next meeting with Kohler are significantly less enthusiastic, reporting that Kohler "has been stable for the last year or so with some hypomania presentation." Third, the ALJ consistently interprets reports that Kohler's condition has been "stable" to mean that Kohler's condition has been good, when the term could mean only that her condition has not changed, and she could be stable at a low functional level. Finally, and most notably, the ALJ's decision never mentions Jewell's opinion that "if Ms. Kohler were capable of working in a sustainable manner in a fulltime position, she would have and maintain such a job." Although the ALJ was not required to give controlling weight to Jewell's opinion, because she is not a "treating source" under 20 C.F.R. § 404.1502, he should have given her opinion some consideration, particularly because Jewell was the only medical professional available to Kohler for long stretches of time in the very rural "North Country" of New York State. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (stating opinion of nurse practitioner who treated claimant on regular basis entitled to "some extra consideration"). We have remanded in other cases where the ALJ has similarly failed to consider relevant probative evidence. *Lopez v. Sec'y of Health & Human Servs.*, 728 F.2d 148, 150–51 (2d Cir. 1984).

While we leave open the possibility that an ALJ's failure to adhere to the regulations' special technique might under other facts be harmless, *cf. Montgomery*, 30 F.3d at 100 (applying harmless error analysis to failure to follow 20 C.F.R. § 404.1520a)*,* the record in this case does not allow us to say that the ALJ's failure here was harmless.  We can neither identify findings regarding the degree of Kohler's limitations in each of the four functional areas nor discern whether the ALJ properly considered all evidence relevant to those areas.  We therefore cannot determine whether the ALJ's decision regarding Kohler's claim is supported by substantial evidence and reflects application of the correct legal standards.[9]

## CONCLUSION

For the reasons discussed, we VACATE the judgment of the district court insofar as it upheld the Commissioner's decision to deny Kohler benefits and we REMAND to the district court with instructions to remand the matter to the Commissioner for further proceedings consistent with this opinion.

---

[9]  During the course of oral argument, it appeared that Kohler's counsel made some measure of concession regarding whether the ALJ's failure to comply with 20 C.F.R. § 1520a was harmless.  Counsel's statements, however, pertained solely to the procedural issue of whether the ALJ's mere failure to document his application of the special technique—whether in a form, as he incorrectly stated, or in the decision—constituted reversible error.  Thus, counsel's statements did not concede the more fundamental issue of whether the ALJ actually complied with 20 C.F.R. § 1520a by making findings regarding the degree of Kohler's limitations in each of the four functional areas, even if he did not strictly comply with the documentation requirement in subsection (e) of that regulation.